UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| EDWARD BOWDEN, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>TOWN OF SPEEDWAY, INDIANA, POLICE )<br>DEPARTMENT, TOWN OF SPEEDWAY; )<br>and TRACEY D. CANTRELL, individually, )<br>)<br>Defendants. ) | CASE NO. 1:06-cv-1172-DFH-TAB |

ENTRY ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

Plaintiff Edward Bowden has sued the Town of Speedway, its police department, and Officer Tracey Cantrell under state tort law and under 42 U.S.C. § 1983.  Bowden asserts that (1) Officer Cantrell did not have probable cause and used unreasonable force to arrest Bowden on December 19, 2004, violating the Fourth Amendment; (2) the Town of Speedway and its police department failed to train, supervise, and discipline its officers appropriately regarding Fourth Amendment requirements; and (3) Officer Cantrell committed the state law torts of assault and battery and false arrest while acting within the scope of his employment.  Plaintiff moved for summary judgment as to liability on only the Fourth Amendment claim for lack of probable cause and the state law false arrest claim.  Defendants filed a cross-motion for summary judgment on all claims.

As explained below, the court grants summary judgment for plaintiff on defendants' liability for the Fourth Amendment claim for an unreasonable seizure without reasonable suspicion and on both state law false arrest claims. This is (one hopes) a fairly unusual case in which, even under the defense version of the facts, a police officer handcuffed a citizen and locked him in a police car without any basis even approaching probable cause or any reason to believe that he posed a physical threat to anyone. Based on the undisputed facts, Officer Cantrell is not entitled to qualified immunity for the initial detention or alleged use of unreasonable force, but under both sides' version of the facts, he is entitled to qualified immunity on the federal claim based on his formal arrest of plaintiff for resisting law enforcement. Summary judgment is denied for defendants on all other claims, including the federal municipal liability claim against the Town of Speedway for inadequately training and supervising its police officers.

*Summary Judgment Standard*

Summary judgment must be granted if the record shows "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A factual issue is genuine if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party. See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual issue is material if resolving the factual issue might change the suit's outcome under the governing law. *Id.* The motion should be granted only if no

rational fact finder could return a verdict in favor of the non-moving party. *Id.* at 249.

When ruling on the motion, the court must view all the evidence in the record in the light most favorable to the non-moving party and resolve all factual disputes in the non-moving party's favor. *Id.* at 255. The moving party need not positively disprove the opponent's case; rather, the moving party must establish the lack of evidentiary support for the non-moving party's position. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The essential question is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52.

The same standard applies even though both sides have filed motions for summary judgment. The court considers each motion independently and will deny both motions if genuine issues of material fact exist. See generally *Employers Mutual Casualty Co. v. Skoutaris*, 453 F.3d 915, 923 (7th Cir. 2006). The court considers the evidence here through two lenses. When evaluating plaintiff Bowden's motion for partial summary judgment, the court resolves all evidentiary conflicts and draws all reasonable inferences in favor of the defendants. When considering the defendants' motion for summary judgment, the roles are reversed.

*Facts for Summary Judgment*

At approximately 1:00 a.m. on December 19, 2004, plaintiff Edward Bowden and his friend Kirk Dreyfuss were unloading boxes from Dreyfuss's car outside an office building in Speedway, Indiana, which is within the city limits of Indianapolis, Indiana. Bowden owned a bottled water business based in Lafayette, Indiana. He filtered the water at his home and delivered it to his customers at various locations. In December 2004, Bowden had about eight customers in Indianapolis. A friend of Bowden's, Bill Kappus, let Bowden store water bottles for these Indianapolis customers at Kappus's office in Indianapolis. Bowden and Dreyfuss were unloading boxes from Dreyfuss's car outside of Kappus's office to make room for water bottles that Bowden wanted to deliver later that morning. Bowden Dep. 43-44.

After Bowden and Dreyfuss put the last box into the office, Officer Michelle Cavarrubio, a part-time officer with the Speedway Police Department, drove by. *Id.* at 45. Dreyfuss's car parked next to the office building and the two men's presence seemed odd at that early hour. Cavarrubio Dep. 5. She radioed for help. Cantrell Dep. 77-78. As he was getting into Dreyfuss's car, Bowden noticed Officer Cavarrubio's car down the street. Using a megaphone, Officer Cavarubbio ordered Bowden and Dreyfuss to stay where they were. Within a few minutes, two other officers arrived, including defendant Tracey Cantrell – a part-time, volunteer officer for Speedway.

According to Bowden and Officer Cavarrubio, the three officers approached Bowden and Dreyfuss while they were sitting in Dreyfuss's car and asked who they were and what they were doing outside the office building at 1:00 a.m. Bowden Dep. 47-48, 61-62; Cavarrubio Dep. 10-12. The two men explained that they were picking up water bottles to deliver. Bowden Dep. 47-48. At some point during these discussions, Kappus, who lived next to the office building, came outside, talked with the officers, and reported that he was friends with Bowden. Bowden Dep. 63-64; Cavarrubio Dep. 12-13. Kappus verified that Bowden and Dreyfuss were picking up bottled water from his office to deliver. *Id.* at 13. According to Officer Cantrell, he first encountered Bowden when Bowden and another individual approached him at his police car near the office building. Cantrell Dep. 83-84.

Both Officers Cantrell and Cavarrubio reported that during their conversations with Bowden, Bowden repeatedly asked why the officers were investigating the situation and loudly asserted that his rights were being violated. Cantrell Dep. 83-85; Cavarrubio Dep. 13-14. Bowden testified, and Officer Cantrell has not disputed, that Officer Cantrell taunted Bowden, accusing him of taking drugs and being high. Bowden Dep. 67-68. At some point, the officers frisked Bowden and Dreyfuss for weapons while the two had their hands on the back of a car. Bowden Dep. 66; Cavarrubio Dep. 14-16; Cantrell Dep. 85-87. The officers found no weapons or contraband during the frisks.

The parties dispute what happened next.  For purposes of defendants'
motion, the court accepts the following facts – as reported by Bowden – as true.
Finding no weapons, the officers asked Dreyfuss if they could search his car.
Bowden Dep. 73.  Dreyfuss agreed and both Dreyfuss and Bowden stepped back
from the car to make room for the officers.  *Id.* at 73-74.  At that point, Officer
Cantrell rushed towards Bowden, grabbed his right arm, and pushed him several
feet.  *Id.* at 74-75, 77-78.  Bowden testified that Officer Cantrell yelled: "Is this the
way it is going to be?  Is this the way it is going to go down?"  *Id.* at 77.  After
pushing Bowden, Officer Cantrell continued yelling at Bowden and pushed him
again, causing Bowden to stumble about fifteen feet before falling to the ground.
*Id.* at 78-81.  During the fall, Bowden hit his jaw, loosening a filling in his mouth.
*Id.* at 87.  As Bowden stood up, Officer Cantrell approached Bowden and placed
a handcuff on his right hand.  *Id.* at 96.  Officer Cantrell violently forced Bowden,
without physically injuring him, onto the hood of the police car to cuff Bowden's
hands behind his back.  *Id.* at 97-98.

For purposes of plaintiff's motion, the court accepts as true the following
facts as reported by Officer Cantrell.  While Officer Cantrell was frisking Bowden,
Bowden removed his hands from the back of the car.  Cantrell Dep. 87-89.  While
Officer Cantrell was looking at Bowden's identification, Bowden again removed his
hands from the back of the car.  *Id.* at 89.  Officer Cantrell then cuffed Bowden's
hands behind his back to detain him "because he was just irate, getting upset .

. . .”  *Id.* at 90.  Officer Cantrell told Bowden he was not under arrest but was detained because Officer Cantrell did not “know what's going on with him.”  *Id.*

Officer Cantrell testified that officers normally make sure to leave a finger's width between the cuff and the person's wrist to avoid unnecessary pain.  *Id.* at 99.  Officer Cantrell did not check the cuffs around Bowden's wrists because he intended to detain Bowden only long enough for Bowden to calm down.  *Id.* at 99-100.  After handcuffing Bowden, Officer Cantrell put Bowden in the back seat of the police car.  Officer Cantrell then left Bowden alone in handcuffs in the back of the police car for what Bowden estimated was about twenty to twenty-five minutes.  Bowden Dep. 103.  During that time, Bowden slid his hands under his backside and feet to bring his cuffed hands in front of him because his hands were starting to hurt.  *Id.* at 110-11.  Officer Cantrell did not estimate how long Bowden sat handcuffed in the back of the police car and has not disputed Bowden's testimony on the point.

Bowden testified that after he had slipped his hands in front of him, Officer Cantrell came back to the police car and continued to taunt him, asking if he wanted to go to jail.  *Id.* at 104-05.  Bowden responded that he did not understand what was going on and did not understand why the officers had a problem with him.  *Id.* at 105.  Officer Cantrell characterized Bowden's talking as Bowden “running his mouth.”  Cantrell Dep. 93.

Officer Cantrell left the car one more time for a brief period before coming back and noticing that Bowden had moved his hands in front of him. Officer Cantrell reported that Bowden had slipped one hand out of the cuffs, smiled at Officer Cantrell, and told Officer Cantrell that he had not wanted the cuffs on and had always wanted to try slipping out of them. *Id.* at 98-99, 106-07. Bowden testified that both of his hands remained cuffed but that after seeing Bowden's hands in front of him, Officer Cantrell told Bowden he was going to jail. Bowden Dep. 111, 113. Officer Cantrell then pulled Bowden out of the car. Officer Cantrell testified that he pulled Bowden out of the car to re-cuff him, making sure this time that there was a finger's width between Bowden's wrists and the cuffs. Cantrell Dep. 99-101. Bowden testified that Officer Cantrell did not re-cuff him (because he remained cuffed the entire time) but pulled him out of the car, accused him of trying to get out of the cuffs, and seemed upset. Bowden Dep. 111, 113. Officer Cantrell stated that until he noticed that Bowden had put his hands in front of him, Officer Cantrell had "no intention on arresting him." Cantrell Dep. 99-101.

Officer Cantrell then took Bowden to the Speedway police station and booked him for resisting arrest in violation of Indiana Code § 35-44-3-3. Another officer put Bowden in a transport vehicle that took him to the Marion County Jail for processing. He appeared briefly before a judge and was then released. On March 14, 2005, the state dismissed the criminal charge against Bowden. Bowden then sued defendants in the Marion Superior Court, and defendants

removed the case to this court.  This court has jurisdiction over Bowden's claims pursuant to 28 U.S.C. §§ 1331 and 1367.  Additional facts are noted as needed, keeping in mind the standard applicable to the relevant summary judgment motion.

*Discussion*

I.   *Fourth Amendment Claims*

    A.   *Initial Detention*

When Officer Cavarrubio saw the parked car and men carrying items into an office building at 1:00 a.m., she initiated what is considered, for Fourth Amendment purposes, an investigative *Terry* stop, named after *Terry v. Ohio*, 392 U.S. 1 (1968).  *Terry* held in part that an officer with a reasonable suspicion that criminal activity might be afoot has the authority to detain a person briefly to investigate the matter on the spot.  *Id.* at 20-21.  In this case, Bowden asserts that Officer Cantrell exceeded the permissible scope of an investigative *Terry* stop by handcuffing him and putting him in the back seat of the police car, amounting to an unreasonable seizure in violation of the Fourth Amendment.  Defendants argue that a *Terry* stop can legitimately encompass handcuffing a suspect and placing him in the back of a police car, and that a later and independent finding of probable cause can erase an earlier, contested Fourth Amendment violation.  Both sides have moved for summary judgment on this claim.

A detention exceeds the permissible scope of a *Terry* stop when the officer's actions effect a "formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *Stansbury v. California*, 511 U.S. 318, 322 (1994) (internal quotation marks omitted). The "only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation." *Berkemer v. McCarty*, 468 U.S. 420, 442 (1984). After finding that an initial stop was permissible under *Terry*, a court must determine whether additional actions and a continued detention were reasonably related to the circumstances that justified the original stop. See *United States v. Glenna*, 878 F.2d 967, 971 (7th Cir. 1989). In all circumstances, however, officers must have – at the very least – a reasonable and articulable suspicion that the detained or arrested individual is involved in some sort of criminal activity. See *Terry*, 392 U.S. at 21-22.

There is no challenge here to Officer Cavarrubio's initial response to seeing the two men moving things into an office building at 1:00 a.m. The court assumes that she had sufficient reasons to stop Bowden and Dreyfuss to learn what they were doing. The court has doubts about whether the officers were also entitled to frisk Bowden and Dreyfuss, but Bowden has not pressed that point and the court does not address it further. Even when viewed in the light reasonably most favorable to Officer Cantrell, the frisk produced no weapons or contraband, and the questioning of Bowden, Dreyfuss, and Kappus had produced no other indications of criminal activity. At that point, Officer Cantrell handcuffed Bowden and put him in the back of the police car for twenty to twenty-five minutes.

Officer Cantrell asserts that he told Bowden that he was not under arrest but was detained because Officer Cantrell did not know Bowden or "what [was] going on with him" and because Bowden had removed his hands twice from the back of Dreyfuss's car during the frisk.  Cantrell Dep. 89-90.  (Bowden denies removing his hands from Dreyfuss's car during the frisk and also denies that Cantrell told him anything about his arrest status.  Bowden Dep. 70, 99-100.  Defendants are entitled to the benefit of the conflicts when deciding plaintiff's motion for summary judgment.)  In any event, the undisputed facts show that after frisking Bowden and finding no weapons or contraband, Officer Cantrell handcuffed Bowden and sat him in the back of the police car for a significant length of time.  These undisputed facts here show that Officer Cantrell violated Bowden's Fourth Amendment rights by doing so.

Defendants assert that handcuffing and placing a suspect in the back of a police car for twenty to twenty-five minutes is within the scope of a permissible *Terry* stop.  To support this assertion, defendants rely on three cases:  *United States v. Robinson*, 30 F.3d 774 (7th Cir. 1994) (affirming defendant's criminal convictions on direct appeal); *United States v. Tilmon*, 19 F.3d 1221 (7th Cir. 1994) (same); and *United States v. Glenna*, 878 F.2d 967 (7th Cir. 1989) (reversing grant of defendant's motion to suppress).

In *Tilmon*, police had reports of a bank robbery in Wisconsin involving a young, black male of average size and a blue Mustang with a gray stripe and

-11-

Minnesota license plates.   19 F.3d at 1223.   The robber had threatened to detonate a bomb at the bank.  *Id.* at 1127.  Two hours after the robbery and about fifty miles away from the robbery scene, an officer saw a blue Mustang with a gray stripe, Minnesota plates, and a black male driver.  The officer radioed for back-up and pulled the car over.  Using a megaphone, police ordered the driver to get out of the car and lie face down on the side of the road.  The driver complied.  Officers handcuffed him, placed him in the back of the police car, and frisked him at gunpoint.  Officers arrested the suspect for armed robbery a few minutes later, and a jury eventually convicted him of the armed robbery.  The *Tilmon* court found that handcuffing such a dangerous suspect before searching him for weapons was reasonable as part of the *Terry* stop.  *Id.* at 1228.

In *Glenna*, an Indiana police department wired a message to a Wisconsin police department reporting that a blond man wearing an orange shirt and green pants, and driving a green van with a motorcycle strapped to the back and with no license plate, was suspected of participating in a drug deal.  878 F.2d at 968-69.  The message indicated that the man might be carrying up to $100,000 in cash and might have several small weapons and an explosive device.  Wisconsin police found and followed the van to a gas station.  While the driver was outside the van, an officer asked him for identification.  As the driver reached into his pocket, the officer noticed a lump in the driver's pocket that looked like a weapon. The officer grabbed the driver's hand and pulled a loaded clip for a nine-millimeter gun out of the driver's pocket.  The officer immediately handcuffed the driver,

frisked him for further weapons, and found an explosive "cherry bomb" in another pocket.  The *Glenna* court stated that the question whether the circumstances permitted the use of handcuffs to detain the driver was a "close one."  The wired message, however, provided reasonable suspicion for the officers to believe that the driver was dangerous.  Finding the loaded ammunition clip confirmed that suspicion.  The officer's decision to then handcuff the driver before frisking him was reasonable and did not exceed the scope of the *Terry* stop.  *Id.* at 973.

In *Robinson*, the court approved a twenty-minute detention of one suspect in the back of a police car while officers questioned another suspect after a frisk revealed no weapons or contraband.  30 F.3d at 779, 784.  During the detention, the officers were accumulating evidence that the suspect was involved in a cocaine distribution operation.  After the frisk, the officers had not handcuffed the detained suspect, and the officers had offered to let the suspect sit in the back of their car because he had repeatedly complained of being cold.  The officers did not handcuff the suspect until they found a bag of cocaine in the snow near where the suspect had passed.  *Id.* at 779-80.

Here, Officer Cavarrubio drove by an office building a little after 1:00 a.m. and noticed that two men and a car were just outside the building.  She thought that their presence seemed suspicious and called for back-up.  So far, so good. That was a reasonable response, and the police were entitled to approach and ask what was happening.  When asked, the two men told the officers that they were

unloading boxes into the office to make room in the car for water bottles stored in the office.  The officers frisked the two men.  The court need not decide whether they had sufficient reasons for doing so, but in any event, they found no weapons or contraband.   The officers were acting based only on Officer Cavarrubio's observations and not on any tips or reports of the men being involved in a crime. The office owner verified Bowden's and Dreyfuss's legitimate explanation of their presence.

While defendants assert that Officer Cantrell did not know that Kappus had verified Bowden's explanation, defendants state in their statement of undisputed facts supporting their summary judgment motion that after frisking Bowden and Dreyfuss, "Cantrell agreed with other officers that there was nothing suspicious occurring."  Def. Br. 4 at ¶ 11.  The only reasons the defendants offer to justify Officer Cantrell handcuffing Bowden and placing him in the police car after the frisk are that Officer Cantrell did not know who Bowden was and because Bowden had removed his hands twice from the back of Dreyfuss's car during the frisk. Cantrell Dep. 89-90.  In the United States of America, those circumstances are not enough to authorize a police officer to handcuff a person and lock him in a police car.

The detention at that point appears to have become an unwarranted custodial arrest, but in any event it certainly exceeded the permissible bounds of an investigatory stop.  Handcuffing and detaining an unarmed, apparently non-

violent person simply because he moved his hands during a frisk clearly violates the Fourth Amendment.  The cases defendants cite to support their argument that the continued detention was an extension of the initial, uncontested *Terry* stop all dealt with suspects who police had good reason to believe were armed and dangerous.  Those cases do not authorize the police to handcuff and lock up in a police car every person they happen to encounter in a *Terry* stop.

Handcuffing a suspect during a *Terry* stop is not and should not be the norm.  *Robinson*, *Tilmon*, and *Glenn*a show that handcuffing can be constitutional if the officers have reasonable cause to believe that they are in personal danger or that the defendant is in the process of committing or has committed a crime.  See also *United States v. Stewart*, 388 F.3d 1079, 1084-85 (7th Cir. 2004) (approving handcuffing and sitting person suspected of robbing a bank with a semiautomatic rifle in back of police car because initial reasonable suspicion had heightened rather than dissipated); *United States v. Smith*, 3 F.3d 1088, 1095-96 (7th Cir. 1993) (approving handcuffing persons suspected of drug trafficking where officer reported that he handcuffed the defendants "because of safety concerns, considering the time of night, the general environment of the investigation and the nature of the alleged offenses."); *Tom v. Voida*, 963 F.2d 952, 957-58 (7th Cir. 1992) (finding that attempting to handcuff a fleeing person suspected of bicycle theft was reasonable).

Here, by the time Officer Cantrell handcuffed Bowden and put him in the police car, he had no reason to believe that Bowden was dangerous or that he had been in the process of committing a crime.  The undisputed facts show that the continued detention exceeded the bounds of a proper *Terry* stop, violating Bowden's Fourth Amendment right to remain free of unreasonable seizures.

Defendants also argue that Officer Cantrell later had probable cause to arrest Bowden for resisting law enforcement and that this later probable cause justified the original detention.  See Def. Br. 18, citing *Kelly v. Myler*, 149 F.3d 641, 647-48 (7th Cir. 1998) (observing that "even if probable cause does not exist for the crime charged, proof of probable cause to arrest the plaintiff on a closely related charge is also a defense"), and *Biddle v. Martin*, 992 F.2d 673, 676 (7th Cir. 1993) (observing that "probable cause need not have existed for the charge for which the plaintiff was arrested, so long as probable cause existed for arrest on a closely related charge").  This attempt to justify an illegal early detention using a second detention based on later events is not at all persuasive.

The cases cited by defendants teach that even if probable cause for a particular charge does not exist, an arrest is valid if probable cause exists for a closely related charge.  That principle, which recognizes that an officer on the street might not pick precisely the right section of a criminal code, presupposes that the substituted probable cause occurs in the context of *the same arrest*. Because Officer Cantrell's continued detention of Bowden, by handcuffing and

putting him in the police car, exceeded the proper scope of a *Terry* stop without any probable cause at that time, any probable cause for a later and separate arrest does not save an earlier, invalid seizure – particularly where the later arrest was supposedly justified only by Bowden's alleged resistance to the earlier unconstitutional detention.   See generally *Holmes v. Village of Hoffman Estate*, 511 F.3d 673, —, 2007 WL 4482207, at *8 (7th Cir. Dec. 26, 2007) ("An arrested individual is no more seized when he is arrested on three grounds rather than one; and so long as there is *a* reasonable basis for the arrest, the seizure is justified on that basis even if any other ground cited for the arrest was flawed."). Accordingly, plaintiff is entitled to summary judgment on the Fourth Amendment lack of probable cause claim for Officer Cantrell's continued detention.

B.   *Formal Arrest*

The second seizure occurred when Officer Cantrell formally arrested Bowden for violating Indiana Code § 35-44-3-3(a), which prohibits resisting law enforcement operations.   Section 35-44-3-3(a)  punishes:

> A person who knowingly or intentionally:  (1) forcibly resists, obstructs, or interferes with a law enforcement officer or a person assisting the officer while the officer is lawfully engaged in the execution of the officer's duties; (2) forcibly resists, obstructs, or interferes with the authorized service or execution of a civil or criminal process or order of a court; or (3) flees from a law enforcement officer after the officer has, by visible or audible means, including operation of the law enforcement officer's siren or emergency lights, identified himself or herself and ordered the person to stop . . . .

Officer Cantrell stated that the sole reason he arrested Bowden under section 35-44-3-3(a) was because Bowden took one hand out of the cuffs and placed both hands in front of him while he was (unlawfully) detained in the back of the police car.  Bowden argues that, even assuming that he wriggled out of one of the cuffs, he did not "forcibly" resist arrest.  Defendants respond that section 35-44-3-3(a) punishes resistance that does not amount to a direct, physical confrontation. Both sides have moved for summary judgment on this claim.

The text of section 35-44-3-3(a) plainly requires a finding of *forcible* resistance, obstruction, or interference.  In *Spangler v. State*, 607 N.E.2d 720, 723 (Ind. 1993), the Indiana Supreme Court defined "forcible" for purposes of section 35-44-3-3(a) as the "use of strength, power, or violence, applied to one's actions, in order to accomplish one's ends."  This use of force is analyzed "from the standpoint of an objectively reasonable police officer . . . ."  *United States v. Ellis*, 499 F.3d 686,  689 (7th Cir. 2007).

In *Spangler*, the Indiana Supreme Court defined "forcible" resistance as active behavior.  When a police officer tried to serve Spangler with court documents at his workplace, Spangler refused to take the papers and told the officer never to bother him at work again.  607 N.E.2d at 721.  As Spangler turned to walk away, the officer ordered him to return or face arrest for disorderly conduct.  Spangler refused and walked to the back of the building.  After the officer got a co-worker to convince Spangler to return, Spangler reiterated his

refusal to accept the summons.  He told the officer "if you want to arrest [me] for something go ahead but otherwise I've got a job to do."  *Id.* at 722.  The officer arrested Spangler for disorderly conduct.  The prosecutor later filed a charge for resisting arrest.

The *Spangler* court found that the statute required "some form of violent action toward another."  *Id.* at 724.  Thus, the statute permitted passive behavior and active behavior that did not involve the use of force.  Spangler's behavior did not constitute "forcible" resistance because it was active but did not involve the use of force against the police officer.

Since *Spangler*, several Indiana Court of Appeals panels have interpreted "forcible" resistance to include conduct that approaches passive resistance or active resistance without force or violence.  See *Johnson v. State*, 833 N.E.2d 516 (Ind. App. 2005) (affirming criminal conviction for resisting arrest on direct appeal); *Bringle v. State*, 745 N.E.2d 821 (Ind. App. 2001) (same); *Guthrie v. State*, 720 N.E.2d 7 (Ind. App. 1999) (same).  In *Johnson*, officers arrested the defendant for blocking traffic with his car.  While being searched, the defendant turned and pushed away with his shoulders and then stiffened his body so that two officers had to physically put him into the police vehicle.  The *Johnson* court found that while the defendant did not resist arrest violently, his leaning back and stiffening were forms of "forcible" resistance, though the court recognized that it was stretching the holding of *Spangler* to reach that conclusion.  833 N.E.2d at 518-

19.   Similarly, in *Guthrie*, officers arrested the defendant for refusing to provide identification.  After officers handcuffed the defendant and took him to the jail, the defendant refused to get out of the car.  Officers had to pick him up out of the car. He then refused to walk, so the officers carried him into the receiving area.  Like the *Johnson* court, the *Guthrie* court found that the defendant's refusals to exit the car and enter the jail using his own locomotion were forms of "forcible" resistance. 720 N.E.2d at 9.

In *Bringle*, an officer pulled the defendant over for speeding.  When the officer approached the car and asked the defendant for identification, the defendant held his license up to the window.  The officer asked the defendant to remove the license from his wallet.  The defendant refused and instead held up a copy of Indiana Code § 9-24-13-3, governing the rights and duties of licensees to display their licenses.  The defendant repeatedly refused to hand over his license and also refused to get out of his car.  The officer tried to open the car door using a tool to unlock the door.  The defendant pressed the door's lock button.  The officer sprayed the defendant with pepper spray through an opening on the passenger side window, after which the defendant started his car.  Another officer managed to get into the car and ordered the defendant to get out.  The defendant remained in the car, clutching the steering wheel, requiring the officers to pry his fingers from the wheel and to remove him forcibly from the car.  While the officers tried to handcuff him, the defendant also kept moving his wrists.  The *Bringle*

court found that this behavior provided several examples of forcible resistance. 745 N.E.2d at 827.

Persons who resist arrest by gripping stationary anchors or stiffening their bodies so that police officers have to physically pick them up and carry them to places of custody are using their strength and power to accomplish that end, though they do not appear to be exerting "some form of violent action toward" the officers. See *Spangler*, 607 N.E.2d at 724. Rather, they seem to be exerting the types of behavior the *Spangler* court found were not outlawed under section 35-44-3-3(a): passive resistance and active resistance without force. See *Ajabu v. State*, 704 N.E.2d 494, 496 (Ind. App. 1998) (reversing conviction for resisting arrest because defendant's actions of "twisting and turning" were active resistance but did not involve "threatening or violent actions toward the police").

A federal court interpreting state law must predict how the state's highest court would act and then rule accordingly. See *Heidelberg v. Illinois Prisoner Review Board*, 163 F.3d 1025, 1027 (7th Cir. 1998). As the foregoing cases show, the Indiana Court of Appeals has struggled with the *Spangler* test and has expanded it in ways that this court respectfully believes go beyond the bounds intended by the Indiana legislature and Supreme Court. The Indiana Supreme Court announced in *Spangler* that section 35-44-3-3(a) applies only when the arrestee's actions have gone beyond active resistance to include "some form of violent action" toward an officer. 607 N.E.2d at 724. Giving the defense the

benefit of conflicts in the evidence in this case, the court assumes that Bowden engaged in "active" behavior when he allegedly managed to bring his hands in front of him and then wriggled out of one handcuff.  But there is no evidence that he acted in a threatening or violent way toward Officer Cantrell.

The Indiana Supreme Court wrote in *Spangler*:  "We believe that one 'forcibly resists' law enforcement when strong, powerful, violent means are used to evade a law enforcement official's rightful exercise of his or her duties."  607 N.E.2d at 723.  This court does not believe that the Indiana Supreme Court would find that Bowden's behavior constituted forcible resistance, particularly given the circumstances of his initial detention.  Note the Supreme Court's use of the phrase "rightful exercise," keep in mind that Officer Cantrell had no business handcuffing Bowden in the first place, and note that section 35-44-3-3(a) applies only while the officer is "lawfully engaged in the execution of the officer's duties."[1]

_____

[1]Indiana courts also have wrestled with the secondary  issue of whether a police officer may arrest someone for resisting an unlawful but peaceful arrest.  In *Fields v. State*, the Indiana Court of Appeals interpreted an older version of the resisting law enforcement statute that prohibited resistance against an officer engaged in the execution of "*any* of the duties of such peace or police officer," without limiting its application to lawful exercise of those duties.  See 382 N.E.2d 972, 975 (Ind. App. 1978) (emphasis added).  In so doing, the *Fields* court adopted a "general rule" that citizens may not resist an unlawful but peaceful arrest:

We feel that the legality of a peaceful arrest should be determined by courts of law and not through a trial by battle in the streets.  It is not too much to ask that one believing himself unlawfully arrested should submit to the officer and thereafter seek his legal remedies in court.  Such a rule helps to relieve the threat of physical harm to officers who in good faith but mistakenly perform an arrest, as well as to minimize harm to innocent bystanders.  The old common law rule has little utility to recommend it

(continued...)

Defendants argue that Bowden acted violently by smiling at Officer Cantrell and dangling his cuffs in the air. Def. Reply 19. As Officer Cantrell stated, someone wearing handcuffs on only one hand has a weapon available for his use. See Cantrell Dep. 106-07. Simply smiling and dangling loosened handcuffs, however, objectively indicates no more than a spirit of resistance and a potential risk, but not the actual use of forcible violence required to violate section 35-44-3-

---

[1](...continued)
under our conditions of life today. We hold that a private citizen may not use force to resist peaceful arrest by one he knows or has good reason to believe is an authorized peace officer performing his duties, regardless of whether the arrest is illegal in the circumstances of the occasion.

*Id.* at 976. In 1976, the Indiana legislature repealed the old statute, Ind. Code § 35-21-4-1, and replaced it with the current statute prohibiting forcible resistance only when an officer is "lawfully engaged" in the execution of his duties, Ind. Code. § 35-44-3-3(a).

While no Indiana court has expressly overruled the "general rule" the *Fields* court announced after the legislature enacted section 35-44-3-3, several courts have discussed exceptions to the "general rule" when interpreting the new statute. See *Wilson v. State*, 842 N.E.2d 443, 447-48 (Ind. App. 2006) (finding that *Fields* did not abrogate common law rule allowing citizens to resist forcibly an officer using unreasonable force to make an arrest); *Shoultz v. State*, 735 N.E.2d 818, 823 (Ind. App. 2000) (same); *Casselman v. State*, 472 N.E.2d 1310, 1315-17 (Ind. App. 1985) (finding that *Fields* did not abrogate privilege to resist forcibly an officer's unlawful entry on private premises). In a footnote, the *Shoultz* court recognized that the adverb "lawfully" was "noticeably absent" in the statute the *Fields* court interpreted. 735 N.E.2d at 823 n.2.

The Indiana Supreme Court has not squarely addressed the relationship between section 35-44-3-3(a) and the "general rule" in *Fields*. In *Row v. Holt*, 864 N.E.2d 1011, 1017 (Ind. 2007) (evaluating defendants' summary judgment motion), the court briefly discussed the "general rule" language in evaluating the existence of probable cause for resisting arrest based on an invalid initial arrest. The court ultimately denied the defendants' summary judgment motion on this issue because of factual disputes about whether the plaintiff had actually resisted. In *Spangler*, the court recognized that section 35-44-3-3 did not "expand an officer's authority to make an arrest" and prohibited forcible resistance of only "authorized" duties. 607 N.E.2d at 725.

3(a).  The *Spangler* court recognized that while police officers deserve protection

in their work, section 35-44-3-3(a) does not create a blanket right to arrest

someone solely for actively resisting arrest without using force:

> While we agree that law enforcement officials deserve additional protections
> in fulfilling their duties, we cannot say that the purpose of the Resisting
> Law Enforcement statute expands an officer's authority to make an arrest.
> Our system of government charges law enforcement officials with upholding
> the laws as the laws are stated.  This statute prohibits the knowing and
> forcible resistance, obstruction or interference with authorized service of
> civil process.  It goes no further.

*Id.* at 725.[2]  Accordingly, summary judgment is granted for plaintiff on the merits

of the Fourth Amendment lack of probable cause claim for the formal arrest,

though the defense of qualified immunity is addressed below.


    C.    *Use of Unreasonable Force*


Bowden also contends that Officer Cantrell used unreasonable force to

arrest him.  Bowden claims that Officer Cantrell shoved him twice, causing him

to fall to the ground and to dislodge a filling in his mouth.  Bowden also claims

that Officer Cantrell forced him down on the hood of a car when first handcuffing

him.  Bowden Dep. 97-98.  Defendants argue that the shove was a reasonable

response to someone who removed his hands from the back of a car while being

---

[2]To be precise, *Spangler* interpreted section 35-44-3-3(a)(2), which applies
to resistance to service or execution of civil or criminal process or orders of a
court.  Bowden was arrested for breaking the more general bar in section 35-44-3-
3(a)(1) against resistance to a law enforcement officer lawfully engaged in
executing the officer's duties.  Both subsections include the identical phrase
"forcibly resists, obstructs, or interferes with."

frisked.  Bowden reported that his hands remained on the car.  Bowden Dep. 66, 70.  Because only the defendants moved for summary judgment on this issue, the court views the facts in the light most favorable to Bowden and assumes that Bowden did not remove his hands from the car while being frisked.

Determining whether the force used was objectively reasonable under the Fourth Amendment requires balancing the nature and quality of the intrusion on the individual's privacy rights against the government interests at stake.  See *Graham v. Connor*, 490 U.S. 386, 396 (1989).  The right to use some degree of physical coercion is inherent in making an arrest or even an investigatory stop. *Id.*  The question is whether the force used was excessive under the circumstances, including consideration of the "severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."  *Id.*

This case is factually similar to *Herzog v. Village of Winnetka*, 309 F.3d 1041 (7th Cir. 2002), in which the Seventh Circuit reversed summary judgment for the defendant police officers.  In *Herzog*, the plaintiff, a middle-aged school teacher, was driving home around midnight after a dinner where she had two sips of wine.  Something went wrong with the lights on her dashboard, so she pulled over to check her exterior lights.  She had not violated any laws or traffic regulations.  An inexperienced police officer pulled up behind the plaintiff and ordered her to get

back into her car.  The plaintiff complied and also provided her license and proof of insurance.  The officer then ordered the plaintiff out of her car, pushed her to the ground, and made the plaintiff perform all sorts of field sobriety tests.  The plaintiff passed all the tests, but the officer still handcuffed and arrested the plaintiff for driving under the influence of alcohol.  The officer forced a "personal breath screening device" into the plaintiff's mouth, cracking the plaintiff's tooth. The test showed no alcohol in the plaintiff's system.  The officer took the plaintiff to the police station and performed another blood-alcohol test, which was also negative.  The officer then took the plaintiff to the hospital for blood and urine tests that were, unsurprisingly, also negative.

The *Herzog* court concluded that "when an illegal arrest sets off a chain of indignities inflicted on the hapless victim, including offensive physical touchings that would be privileged if the arrest were lawful, she is entitled to obtain damages for these indignities whether or not they are independent violations of the Constitution."  *Id.* at 1044.  See also *Payne v. Pauley*, 337 F.3d 767, 779 (7th Cir. 2003) (finding that it was not objectively reasonable for an officer to shove to the ground "a woman who was not threatening to harm the police officer or anyone else at the scene, was not resisting or evading arrest, was not attempting to flee, and was charged with" obstructing a police officer).

Here, according to Bowden, Officer Cantrell frisked him simply for being outside an office building at 1:00 in the morning.  He found no weapons or

-26-

contraband during the frisk.  After Bowden and Dreyfuss backed away to let the officers search Dreyfuss's car, Officer Cantrell grabbed Bowden's arm and shoved him twice, causing him to stumble to the ground and dislodge a filling in his mouth.  Like the officers in *Herzog* and *Payne*, Officer Cantrell did not have probable cause to arrest Bowden and, according to Bowden's evidence, used unwarranted and unreasonable force in shoving him.  Defendants are not entitled to summary judgment on the excessive force claim.

D.   *Municipal Liability for Failure to Train, Supervise, and Discipline*

Bowden next asserts that his rights were violated because the Town of Speedway had in place municipal policies, customs, or practices that caused Officer Cantrell to have been inadequately trained, warranting municipal liability under 42 U.S.C. § 1983 under the standards of *Monell v. Department of Social Services of New York*, 436 U.S. 658 (1978).  Only defendants moved for summary judgment on this issue.

In Indiana, after police officers complete their initial course work and training, they must complete sixteen hours of additional training per year to keep their certifications.  Cantrell Dep. 48-49.  The Speedway Police Department's training policy – effective July 1, 1998 – states: "Sworn employees shall receive a minimum of 16 hours of in-service training per year.  IT SHALL BE THE RESPONSIBILITY OF THE INDIVIDUAL, NOT THE DEPARTMENT, TO ENSURE

THAT HE HAS OBTAINED THE REQUIRED NUMBER OF HOURS." Cantrell Dep. Pl. Ex. 10.  In 2003, the year Officer Cantrell began working for Speedway as a part-time volunteer deputy, he completed only eight of the sixteen required training hours.  Cantrell Dep. Pl. Ex. 7.  In 2004, Officer Cantrell completed only twelve and a half hours of the required training.  Cantrell Dep. Pl. Ex. 8.

No one ever disciplined Officer Cantrell for his failure to complete the required number of training hours for 2003 and 2004.  In his deposition, Officer Cantrell recognized that he had not completed the required hours but stated that he thought he had effectively complied with the requirements because the department never suspended him.  Cantrell Dep. 66-67.

As a part of his initial training to be a deputy, Officer Cantrell took forty hours of "pre-basic law."  *Id.* at 20.  In 2003, while working at the Speedway Police Department, Officer Cantrell took a four-hour class to refresh the topics he learned in his basic law class.  *Id.* at 50.  The refresher class included some education about probable cause.  In his deposition, Officer Cantrell stated that he thought that his training about the use of a force continuum chart – a guide for determining how much force an officer can and should use in different situations – applied to determining whether probable cause existed for charging someone with resisting arrest.  *Id.* at 50, 63.  Later in his deposition, Officer Cantrell stated that "a long time ago" his basic training had taught him the difference between someone exercising his First Amendment rights and someone interfering with

official duties.  *Id.* at 63-64.  Before arresting Bowden in December 2004, Officer Cantrell estimated, he had made five arrests for resisting arrest – all around the time of the 2004 Indianapolis 500 race.  *Id.* at 64-65.

A municipality cannot be liable under section 1983 based on a common law *respondeat superior* theory but can be liable for injuries resulting from the execution of a municipal policy or custom.  See *Monell*, 436 U.S. at 694-95.  A municipality may be liable for failing to train its police officers only if "the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact."  *City of Canton v. Harris*, 489 U.S. 378, 388 (1989). Occasional negligence in administration is not enough.  *Id.* at 391.  The plaintiff must show deliberate indifference through the failure to provide adequate training in light of the foreseeable consequences or through the failure to act in response to repeated complaints of constitutional violations by its officers.   See *Sornberger v. City of Knoxville*, 434 F.3d 1006, 1029-30 (7th Cir. 2006).

Defendants argue that Bowden has not met the actual or constructive knowledge standard discussed in *Cornfield v. Consolidated High School District No. 230*, 991 F.2d 1316 (7th Cir. 1993).  In *Cornfield*, school staff members suspected that the plaintiff, a student in a behavioral disorder program, was hiding drugs under his clothes.  When asked if he was hiding drugs, the plaintiff got angry and started yelling obscenities. When the dean called the plaintiff's mother for consent to search her son for drugs, the plaintiff's mother refused.  The dean and the

plaintiff's teacher then took the plaintiff to a locker room, had him undress in their presence, and found no drugs.  The school had no explicit policy governing searches of students.  The *Cornfield* court affirmed summary judgment for the defendants and rejected the plaintiff's argument that the dean's behavior or the school's failure to create an explicit policy created municipal liability.

The court also rejected the plaintiff's claim that the school acted with deliberate indifference in failing to train staff members how to investigate contraband and how to conduct student searches.  Liability must be based on the policymaker's actual or constructive notice that a particular omission is likely to cause constitutional violations.  *Id.* at 1327.  A failure to train employees may violate section 1983 "with respect to a clear constitutional duty implicated in recurrent situations that a particular employee is certain to face."  *Id.*  Because of the unclear standards governing student searches, the *Cornfield* court found that school boards and officials "cannot be held accountable on this ground because the particular constitutional duty at issue is not clear."  *Id.*

Here, unlike in *Cornfield,* Speedway had an explicit policy that required all officers to take sixteen hours of in-service training per year.  It was also eminently foreseeable that officers would face situations in which they would need to decide whether to detain and handcuff suspects.  Yet the town policy placed the responsibility of ensuring that officers undergo the proper amount of training on the individual officers.  Plaintiff has shown that Officer Cantrell violated this policy

in 2003 and 2004 and that Speedway never disciplined him for those violations. If proven, those facts could allow a jury to find that Speedway's policy was to announce a superficially acceptable training "requirement" and then simply to hope that its officers voluntarily met the requirement.  A jury could also find that it was foreseeable to the town that such a hollow policy would result in these types of constitutional violations.  Cf. *Tapia v. City of Greenwood*, 965 F.2d 336, 339 (7th Cir. 1992) (overturning jury verdict against city for failure to train police officers where the plaintiff "offered no evidence to indicate that the City failed to adhere to minimum standards for training police officers under Indiana law").  It is possible that Speedway has an additional policy for disciplining officers who violate the training policy and that Officer Cantrell's unpunished violation and continued employment was anomalous.  But defendants have not yet produced or described any such practice of supervision or discipline to counter plaintiff's evidence of deliberate indifference.  Accordingly, on this record, summary judgment is denied for defendants on the municipal liability claim.


II.     *Qualified Immunity*

        In response to Bowden's federal claims, defendants assert that Officer Cantrell is entitled to qualified immunity on the claims against him in his individual capacity.  A government official is not entitled to qualified immunity for individual liability where the facts a plaintiff alleges (1) reveal a constitutional violation (2) according to "clearly established" law at the time.  *Saucier v. Katz*,

533 U.S. 194, 201-02 (2001); *Anderson v. Creighton*, 483 U.S. 635, 639-40 (1987); *Marshall v. Teske*, 284 F.3d 765, 772 (7th Cir. 2002).   A violation is "clearly established" where (1) the violation is so obvious that a reasonable officer would know that his actions violated the Constitution, or (2) a closely analogous case establishes that the conduct is unconstitutional.   *Siebert v. Severino*, 256 F.3d 648, 654-55 (7th Cir. 2001); *Brokaw v. Mercer County*, 235 F.3d 1000, 1022 (7th Cir. 2000) ("a plaintiff need not always identify a closely analogous case" to show that a violation is "clearly established").

As discussed above, Officer Cantrell's continued detention of Bowden after frisking him and finding no weapons and without having any suspicion that Bowden was engaged in criminal behavior violated clearly established law.   Courts spend substantial time discussing the reasonableness of suspicion needed to warrant a *Terry* stop and the proper scope of a *Terry* stop, but there is no question that an officer must suspect an individual of committing a crime and being threatening, rather than generally insolent, to warrant continued detention, particularly in handcuffs.   See generally *United States v. Place*, 462 U.S. 696, 700-707 (1983) (recognizing that an officer must have a "reasonable, articulable suspicion that the person has been, is, or is about to be engaged in criminal activity" to frisk an individual for weapons and must have probable cause to conduct a further seizure); *Terry v. Ohio*, 392 U.S. 1, 17-22 (1968); *Beck v. Ohio*, 379 U.S. 89, 91 (1964) (observing that an arrest is valid if "at that moment the facts and circumstances within their knowledge and of which they had reasonably

trustworthy information were sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense."). Officer Cantrell is not entitled to qualified immunity for his initial detention of Bowden when he handcuffed him and put him in the police car.

Cantrell's arrest of Bowden for resisting law enforcement presents a more subtle question. As revealed by the tension between the *Spangler* and *Ajabu* cases, on one side, and the *Johnson*, *Bringle*, and *Guthrie* cases on the other side, Indiana law needs clarification about whether non-violent, non-forcible behavior amounts to a violation of Indiana Code § 35-44-3-3(a). Plaintiff has not presented a closely analogous case clearly establishing that Bowden's behavior lacked force. Based on *Johnson*, *Bringle*, and *Guthrie*, an officer might have had probable cause to believe that Bowden's alleged actions gave him probable cause to arrest him for resisting arrest. Thus, Officer Cantrell is entitled to qualified immunity on the Fourth Amendment claim for his formal arrest of Bowden.

Officer Cantrell is not entitled to qualified immunity on the excessive force claim. As noted above, Bowden asserts that Officer Cantrell violently shoved him twice simply for backing away from a car that Officer Cantrell was about to search. Based on Bowden's evidence, that conduct would have been an obviously unreasonable use of force. See *Payne v. Pauley*, 337 F.3d 767, 778-79 (7th Cir. 2003) (finding that officers were not entitled to qualified immunity for excessive force claim at summary judgment stage based on facts seen in light most

favorable to plaintiff); *Herzog v. Village of Winnetka*, 309 F.3d 1041, 1044 (7th Cir. 2002) ("If the facts are as alleged, a reasonable police officer in the position of these defendants would have known for sure that his actions violated the Constitution, and so the defendants cannot shelter behind the defense of official immunity."). Bowden's account presents triable issues of fact and, if accepted, would support findings of a clear and obvious unconstitutional use of force. Officer Cantrell is not entitled to qualified immunity on Bowden's claim for use of unreasonable force.

III.   *Indiana Tort Claims Act*

A.   *Assault and Battery*

Bowden next argues that Officer Cantrell committed assault and battery by shoving him. Under Indiana law, a police officer may use only the force that is reasonable and necessary for effecting an arrest. Ind. Code § 35-41-3-3(b). If an officer uses unnecessary or excessive force, the officer may commit the torts of assault and battery. *Crawford v. City of Muncie*, 655 N.E.2d 614, 622 (Ind. App. 1995); *City of South Bend v. Fleming*, 397 N.E.2d 1075, 1077 (Ind. App. 1979). Indiana's excessive force standard effectively parallels the Fourth Amendment standard discussed above. See *O'Bannon v. City of Anderson*, 733 N.E.2d 1, 3 (Ind. App. 2000). Because of the same factual issues that bar summary judgment on the Fourth Amendment unreasonable force claim, summary judgment is denied for defendants on this claim.

B.     *False Arrest*

Bowden also asserts that Officer Cantrell falsely arrested him. Indiana false arrest law essentially tracks the Fourth Amendment analysis for unreasonable seizure claims. See *Row v. Holt*, 864 N.E.2d 1011, 1016-17 (Ind. 2007) (observing that false arrest requires lack of probable cause, which turns on "whether a reasonable person, under the facts and circumstances encountered by the arresting officer, would believe that the suspect had committed or was committing a criminal offense"). Following the same analysis above, summary judgment is granted for plaintiff and denied to defendants with respect to both of Officer Cantrell's unreasonable seizures of Bowden – the original detention in handcuffs and the later arrest for resisting law enforcement. Under the Indiana Tort Claims Act, officers who make false arrests are not entitled to immunity. Ind. Code § 34-13-3-3(8); *Cantrell v. Morris*, 849 N.E.2d 488, 494 (Ind. 2006) (finding that the Indiana Tort Claims Act has "largely displaced" the state qualified immunity doctrine).

*Conclusion*

For the foregoing reasons, the court GRANTS summary judgment for plaintiff on the Fourth Amendment lack of probable cause and state law false arrest claims. Officer Cantrell is entitled to qualified immunity for the formal arrest but not for the initial detention or alleged use of unreasonable force. Summary judgment is DENIED for defendants on all other claims.


So ordered.

Date: February 13, 2008

_____
DAVID F. HAMILTON, CHIEF JUDGE
United States District Court
Southern District of Indiana

Copies to:

Christopher Douglas Cody
HUME SMITH GEDDES GREEN & SIMMONS
ccody@humesmith.com,christopherdcody@yahoo.com

Robert M. Kelso
KIGHTLINGER & GRAY
rkelso@k-glaw.com,mcollins@k-glaw.com

Andrew P. Wirick
HUME SMITH GEDDES GREEN & SIMMONS
awirick@humesmith.com,Lendris@humesmith.com